Sam GOULD et al., Appellants,

v.

KANSAS CITY, Missouri, Respondent.

No. 46636.

Supreme Court of Missouri,

Division No. 1.

Sept. 8, 1958.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 13, 1958.

Butler Disman, Herbert Jacob, Solbert M. Wasserstrom, Kansas City, for appellants.

Benj. M. Powers, City Counselor, Guy W. Rice, Asst. City Counselor, Frank O. Benson, Asst. City Counselor, Kansas City, for respondent.

DALTON, Judge.

This action constitutes a direct attack upon zoning ordinance No. 18931 of Kansas City, Missouri, on the ground that, as applied to plaintiffs' described real estate, the ordinance is arbitrary, unreasonable, discriminatory and confiscatory and, therefore, unconstitutional and void. Plaintiffs designate the action as one for declaratory judgment, injunction, mandamus and other relief. Ordinance No. 18931, adopted May 20, 1955, re-enacted and continued in force R–4 zoning restrictions in a low apartment residential district, including restrictions against temporary or seasonal off-street commercial parking stations in the portion of the R–4 area in which plaintiffs' property was located, but authorized such commercial parking stations in another portion' of the R–4 area. After a hearing on the merits, the trial court denied relief and dismissed the petition. Plaintiffs have appealed.

A long record is presented for review. Certain facts have been stipulated, but there are many exhibits, including printed documents such as ordinances and proposed ordinances, reports of hearings, financial reports, detailed data as to traffic conditions and many plats and photographs. Some of the facts shown by oral testimony are not disputed but, on certain essential fact issues, we find directly conflicting oral testimony. We have carefully reviewed the entire record and will here briefly state some of the evidence. The action being one in equity in which affirmative equitable relief is sought in addition to a determination of the validity of the ordinance, we must review the record de novo and reach our own conclusion as to the weight and value of the evidence, giving due deference to the trial chancellor's findings on the oral testimony of witnesses who appeared before him.

The record shows that plaintiff Gould is primarily engaged in the operation of commercial parking lots and operates five such lots near the Kansas City Municipal Stadium. Plaintiff Baseball Parking Company is a family corporation in which plaintiff Gould is a stockholder. Plaintiff Gould is the owner and the corporation is lessee of the property here in question which fronts on the west side of Brooklyn Avenue, between 24th Street and 24th Street Terrace, in Kansas City. The tract is

irregular in shape, with a frontage of 130 feet on Brooklyn, but it narrows in a tapering fashion toward the west. It does not face on any other street, but a plotted, unopened street, crosses the property. The tract consists of three pairs of lots running lengthwise. Its total area is a little more than one acre.

When acquired the property was vacant, rough, and gullied. It had been "a hole" and had been filled with dirt hauled from the Lincoln High School area when that building was constructed. Weeds grew and bottles and beer cans had been deposited in the area. In 1953, plaintiff Gould acquired the property (2410 Brooklyn) in two parcels for approximately $3,000. He purchased the property as a speculative venture, anticipating and hoping that Kansas City might sometime have a major league baseball club. The area was zoned R-4, low apartment buildings, small homes, rooming houses, a residential area. Seasonal or temporary parking was not legally authorized in districts R-1 to R-4, inclusive, prior to the adoption of ordinance No. 18931.

In February 1955, plaintiff Gould had the ravines and gullies leveled by bulldozer and grader and the property put in shape to apply crushed rock to give it a hard surface. A day or two after the work started, a group of neighbors to the north appeared and wanted to know what he was "going to put there." When advised that he was preparing the property for use as a parking lot, they advised that he "could not do it." He knew he was "running into some obstacles there from the neighbors," but he continued with the work and finished the blading off and leveling up process and then hard-surfaced the lot. He did not know that temporary or seasonal commercial parking was not permitted in the area until February or March 1955, but, when he discovered this fact, he consulted counsel and was advised to complete the project. The improvements were made without obtaining a permit from the city. On April

11, 1955, he was served with a cease and desist order, but his attorneys contacted the city authorities and he was given 30 days time and permitted, along with other lot owners, to operate his commercial parking lot until May 12, 1955, or a total of 11 or 12 days during the baseball season in 1955, in violation of the provisions of the ordinance. In 1956, he oiled and antidust treated the surface of the lot and built a six foot woven wire fence back of the adjoining residence property on 24th Street.

When this action was filed in April 1956, he obtained a temporary restraining order from the circuit court and operated a commercial parking lot on the premises during the 1956 baseball season, for 40 night games and about 34 day games, a total of 66 days. The temporary restraining order was rescinded when the final decree was entered. The capacity of the parking lot was 250 to 275 cars, but the average number of cars parked was 165 to 175. The improvements made in 1955 cost between $2,500 and $3,000 and those made in 1956 cost about $1,000. The market value of the improved lot on July 23, 1956, subject to the existing R-4 zoning restrictions, was approximately $7,500.

The Kansas City Municipal Stadium is located on the west side of Brooklyn Avenue between 20th and 21st Streets. It is east of the Lincoln High School grounds and is across 22nd Street north of the Lincoln Coles Junior High School. No parking is provided on the Stadium location. The territory immediately surrounding the Stadium location is zoned M-1, light industrial district, and this M-1 area is surrounded on the east, west and south by territory zoned R-4, where prior to May 20, 1955, commercial parking stations had been prohibited since 1923. Plaintiffs' property is located some two and one-half city blocks south of 22nd Street which adjoins the south side of the Stadium. There is a level grade from the Stadium to plaintiffs' property. A small C-1 neigh-

borhood retail business district is located at the intersection of 24th Street and Brooklyn Avenue covering the four corners of the intersection and, in this area, there are two grocery stores. The evidence shows certain business places in the territory zoned R–4, which business places were shown to have been in existence many years and which, we assume, were non-conforming existing uses when zoning was first adopted. It was stipulated that plaintiffs claim no legal non-conforming use of their property.

The petition alleges and the answer admits that prior to 1955, Kansas City, Missouri was the home of the Kansas City Blues, a professional baseball team in the American Association, which is commonly known as "a minor league." In 1954 it became known that the franchise and location of the Philadelphia Athletics, a baseball team which is a member of the American League was subject to transfer. The American League is commonly known as one of the "big leagues." In a campaign by Kansas City leaders to have the said Athletics' franchise acquired and the team relocated in Kansas City, a special bond election was held in which the voters overwhelmingly authorized the purchase of the the Kansas City Blues' Stadium and the improvement thereof to increase its seating capacity. The Stadium was, thereafter, purchased, enlarged and improved and renamed "The Municipal Stadium." It was admitted that, during the years in which the Kansas City Blues played in Kansas City, much territory zoned R–4, low apartments, residential, was illegally used for parking purposes. The area is served by one of the larger south-north traffic arteries, to wit, Brooklyn Avenue, which constitutes one of the principal routes for public service transportation, as well as for private vehicular traffic, but there are a number of streets in the vicinity of said Municipal Stadium that are narrow.

Plaintiffs' evidence further tended to show that, after the improvement of the Stadium and its use by the Athletics, 24th Street was made a one way street for eastbound traffic; that the seating capacity of the Stadium was increased to 30,611 and more off-street parking was needed to protect the public investment in the Stadium; that 10,000 parking spaces were needed within easy walking distance of the Stadium, but were not available; that attendance at the Stadium doubled after the Athletics were playing there; that there was an inadequate number of parking spaces in the area especially between 20th Street and 24th Street Terrace and between Vine and Prospect Avenues; that inadequacy of parking facilities slows traffic, endangers pedestrians and increases fire hazards, since emergency vehicles cannot get through; that the elimination of any parking lot in the area would tend to increase congestion in the streets and increase the inadequacy of parking facilities available for use by patrons of the ball games; and that more off-street parking on lots, such as plaintiffs, would help to reduce traffic congestion, delay and hazards.

There was evidence that, as far as the management of the Athletics was concerned, a lot more off-street commercial parking was needed, especially to the south of the Stadium, since the management had received many complaints as to the parking situation and the lack of commercial off-street parking had an adverse effect upon attendance at baseball games. On November 27, 1956, the administrative assistant to the Director of Public Works of Kansas City, who had jurisdiction over the Kansas City Municipal Stadium, made an insistent written demand upon the Kansas City Board of Education for a continuance of public parking on premises of the Lincoln Junior High School, "as essential to even a satisfactory operation" of the Municipal Stadium. In another letter he had stated that "our chief disadvantage lies in the unavailability of additional off-street parking spaces." There was evidence that, after the Athletics began to play, the pressure for parking around the Municipal Stadium

was so intense that space for automobile parking was sold in front yards, side yards and back yards of private homes throughout the area where commercial off-street parking stations were prohibited by ordinance.

The only material difference between the old ordinance and the new ordinance, as far as we are here concerned, is that the new ordinance authorized and permitted temporary or seasonal commercial parking stations in an area bounded on the west by Vine Street, on the east by Prospect, on the north by 20th Street and on the south by 24th Street Terrace, except for an area of approximately four blocks adjacent to the south line of the re-zoned territory, which four blocks remained subject to the same R-4 zoning restrictions that exist south of 24th Street Terrace and, therefore, adjacent to the mentioned four block area lying north of 24th Street Terrace. In other words, the line between R-4 territory in which commercial parking was permitted and the R-4 territory in which commercial parking lots remained prohibited was located about one block north of plaintiffs' property. The theory of plaintiffs' petition is that the dividing line between the R-4 territory in which temporary or seasonal commercial parking lots are permitted and that part of the R-4 territory where such parking is not permitted should have been south of plaintiffs' described property, so that a commercial parking lot could be operated on plaintiffs' property.

Plaintiffs' evidence further tended to show that the whole area north of 24th Street Terrace and between Vine and Prospect is dominated by the Municipal Stadium; that the Stadium lights illuminate the whole area; that successful operation of the Stadium is very important to the city and its people; that traffic became heavy and traffic congestion serious in the area after the Athletics came to Kansas City; that traffic congestion is worse after a game than before, since everybody wants to get out when the game is over; that the

residences on 24th Street north of plaintiffs' lot are located on a level with plaintiffs' property and they are well screened from the lot by natural growth and a woven wire fence constructed by plaintiff Gould; that there had been no disturbance of the adjoining residents and no trespassing since the six foot fence was erected; that there was no dust from the lot in 1956, no honking of horns and no fights on the property; that other home areas, where temporary or seasonal commercial parking is allowed, are equally as good as the area surrounding plaintiffs' property where such parking is prohibited; that the neighborhood about plaintiffs' property was a very fine neighborhood many years ago, but that it had declined with age and obsolescence and increased heavy traffic on Brooklyn and 24th Street; that the whole area had declined so that the installation and operation of a commercial parking lot on plaintiffs' property would not be detrimental; that no damaging effect would result; that there is no sale for the good residence properties on 24th Street; and that they are surrounded by an area completely dominated by the baseball stadium.

Plaintiffs' evidence further tended to show that the highest and best use for plaintiffs' property in its present improved condition is use as a commercial parking lot in connection with events at the Municipal Stadium; that its value for such purposes is $43,000 to $47,860; that the shape of the property is not good for use for low apartments or residences; that platting would be very difficult; that the property had virtually no use for development purposes; that it would be impossible to get financing through any of the customary sources for the development of the property for residential purposes; that the use of the Stadium had no effect on that matter; that any housing development in the area would be difficult to finance; that the inability to finance was "not because it was a colored district," but because of the age and decline and obsolescence of the area; and that, subject to present zoning

restrictions, plaintiffs' property was only salable to speculators.

As stated, during the years in which the Kansas City Blues played in Kansas City some land in the R–4 district was illegally used for commercial parking purposes and there was some such parking on a small area of what is now plaintiffs' property. Illegal parking increased in the area with the use of the Stadium by the Athletics, that is, until the city took action to authorize parking lots in a part of the R–4 area and to stop illegal parking in the remaining part of the R–4 area.

Defendant's evidence tended to show that, there is very little reflected light from the Stadium in the area where plaintiffs' property is located, since most of the Stadium lights are three blocks away; that the homes on both sides of 24th Street, west of Brooklyn and west of the C–1 district, and immediately north of plaintiffs' property, are predominately single-family homes, well maintained; that those along 24th Street Terrace to the south of plaintiffs' property are also generally well maintained middle-income homes; and that, while the properties further to the south aren't in as good condition or as well maintained, yet in terms of a zoning district they are of one general class or character.

While there were some nice homes, well-kept and maintained, east and west and north of the four block area of R–4 territory north of 24th Street Terrace, and while temporary or seasonal commercial parking lots are permitted under the ordinance of May 20, 1955, in this R–4 area, these nice homes do not constitute a group for zoning purposes in the same manner that the area surrounding plaintiffs' property, and the area to the south of it, provides a zoning area. The failure to authorize temporary or seasonal commercial parking in the area where plaintiffs' property lies was not spot zoning, since the four block area mentioned is only a part of the other, or remaining, R–4 area to the south where no such parking is permitted.

There was evidence that, except for the rule against spot zoning, the residents of the area surrounding the plaintiffs' property might have reasonably hoped for an R–1 residential area rating and protection, but because the R–1 type area is small, the area is controlled in zoning by the general character of the larger area and is properly zoned R–4. The owners of 40 to 50 lots in the immediate area of the plaintiffs' property have evidenced a strong attitude to maintain the character of their residential district. While not asking for the full protection of an R–1 district, they have been seeking to maintain their present R–4 district restrictions. In connection with this matter, counsel for plaintiffs stated: "I would be happy to stipulate that they have had a tremendous interest in the proceedings with regard to this Gould property. I will agree that they have been interested and they have pressed it, their opposition to it, in every possible way."

The evidence further showed the existence of a "24th Street Neighborhood Club" that had been in existence for thirty-seven years. The purpose of this club was to take effective action, as a group, to maintain the standards of the neighborhood and take care of problems, where changes would bring a decrease in valuation or detract from the neighborhood. As to the membership of this club and their homes, a witness testified: "We have people who have lived in there for many years, teachers, physicians, lawyers, railroad personnel, and that type of thing. * * * They are good, substantial buildings; most of them built their own homes." Members of this club had protested the illegal operation of plaintiffs' commercial parking lot to the city council, a committee thereof and its members, and before the City Plan Commission. Neighbors residing in the immediate vicinity of plaintiffs' parking lot, who had had personal experience with its objectional features, testified in this cause concerning the noise from automobiles being parked on the lot, traffic in and out of the lot, people going and coming, the glare of the

headlights, the sounding of horns, the lights from the cars shining into yards and houses, the almost total destruction of privacy in their back yards and homes with back yards becoming as public as the streets, the presence of trespassers from the parking lot crossing their properties and hurdling the gap between the fences, or going around, the noise and disturbance from cars starting up and leaving the lot until midnight after the night games, and the fact of bottles and beer cans being thrown on their property. The noise and disturbance from the operation of the lot was worse in 1956 than in 1955, because of the increased use of the lot. One of plaintiffs' witnesses testified, "Naturally, there is going to be a fair amount of noise on a parking lot, because of the cars starting up."

There was evidence that plaintiffs' property was suitable for other uses than commercial parking lot purposes, such as for a group housing project, or for apartments, or it could be used for other purposes. It could be used as any other R–4 lot out of the special district is used, or for church purposes or certain types of private clubs allowed in the R–4 area. The witnesses conceded that the present was not a good time to build, in view of today's market, and it might not be easy to get funds from a commercial agency, but the property could reasonably be used for many other R–4 purposes, rather than for a commercial parking lot to the detriment of the surrounding area.

There was evidence that by reason of the hard-surfacing of plaintiffs' lot it had created an abnormal condition of storm water drainage, since the run-off was 80 to 90 percent, rather than 15 to 20 percent from grass covered yards; that residential properties adjoining any public parking area are always subjected to a higher degree of litter trespass, noise and dust, than other properties; that there was always the problem of trespassers; that it is hard to police the public on commercial parking lots; and that, no matter how well intended the operator of the lot may be, protection cannot be given adjoining properties.

Other evidence tended to show that illegal parking and the violation of zoning regulations in the R–4 area was not a sign that there was an inadequate amount of suitable parking to meet reasonable needs; that in view of the amount of area opened to seasonal or temporary commercial parking stations by the ordinance of May 20, 1955, all the parking demand is satisfied in the area; that rear lot lines were properly used in fixing the dividing line between the area in which commercial parking stations were allowed and the area in which such stations were prohibited; that you can't afford to provide parking facilities for crowds that only occur three times a year or less; and that, excepting the four block area north of 24th Street Terrace, from the other R–4 area to the north; where parking was permitted, was not a matter of spot zoning, but a mere matter of legal description in designating the boundary line of the area in which commercial parking lots were to be allowed.

After two public hearings before the City Plan Commission in 1955 where much evidence was heard, the Commission made a report of its findings and a recommendation to the City Council that the area in which plaintiffs' property was located be not included in the area where temporary or seasonal commercial parking lots were to be authorized. After the institution of this action and prior to the submission of the cause to the court, the City Plan Commission on September 9, 1957 held a public hearing pursuant to due notice on the City Plan Commission's own application to re-zone the area where plaintiffs' property is located and to allow temporary or seasonal commercial parking, but, after a hearing, the application was denied. A new city ordinance, ordinance No. 21729, was adopted September 6, 1957, re-zoning property in the area lying generally between Prospect Avenue and Vine Street and from 20th Street

to 24th Street Terrace as zone RPT, temporary automobile parking, but the new ordinance again excluded the plaintiffs' property and the immediate area surrounding it in exactly the same manner as did ordinance No. 18931.

Among other things, the trial court found that "the district immediately south of 24th Street Terrace is zoned R–4; that there are no licensed parking lots in that area nor in the disputed area north of 24th Street Terrace; that both of said areas have been residential areas and have retained their residential character to a higher degree than have the areas to the east, west and north of the disputed area; that said areas to the east, west and north include C–1, C–2, and M–1 districts, have to a greater degree lost their residential character, and have become commercial in many areas; * * * that defendant's ordinance, Committee Substitute for ordinance No. 18931, did not re-zone plaintiffs' property or impose any restrictions thereon, did not impair the value thereof, and did not constitute a taking or damaging of plaintiffs' property; * * * that said ordinance is reasonable and valid under the State Enabling Act (Sec. 89.010 et seq. RSMo 1949, V.A.M.S.) and is a fair and reasonable exercise of defendant's police power, resting upon a rational classification, and applying alike to all persons and things falling within a designated class."

Under "points relied on," appellants say that "a zoning ordinance may be unconstitutional as to a particular tract even though valid in its general scope"; that "a zoning ordinance may become unconstitutional by change of conditions, even though it was valid at the time of enactment"; and that the fact that Mr. Gould had constructive knowledge of the existence of the present restrictions when he purchased the property is immaterial. Numerous authorities are cited in support of these principles which are not in dispute.

Appellants then contend that the judgment entered by the trial court is erroneous because, under the conditions now existing, zoning ordinance No. 18931 of Kansas City, as it applies to plaintiffs' property, is unconstitutional and void. Appellants cite Sections 2, 10, 26 and 28 of Article I of the Constitution of Missouri 1945, V.A.M.S., and the 14th Amendment to the Constitution of the United States. Under the above assignment appellants contend that the said "Zoning Ordinance, as it applies to plaintiffs' property, has no reasonable relationship to public welfare and is actually contrary thereto"; that "said ordinance, as it applies to plaintiffs' property, is at most for the private benefit of plaintiffs' neighbors"; and that "the ordinance, as applied to plaintiffs' property, is discriminatory" and "confiscatory." It will be noted that there is no reference whatever to any particular part of the ordinance. The assignments are general and directed to the ordinance as a whole. As stated, the ordinance zones the territory where plaintiffs' property is located, as R–4, low apartments, a residential area.

In the statement of facts in their brief appellants refer to this action as one seeking relief "against enforcement of zoning restrictions confining the use of their land to residential purposes." In the printed argument they say "the restriction against the use of plaintiffs' land for parking purposes bears no reasonable relationship to public welfare"; and that "no public interest is served by preventing the use of plaintiffs' property for parking purposes." We conclude that the sole issue intended to be presented upon this appeal is whether the mentioned ordinance is unconstitutional and void as to plaintiffs' property, because the ordinance prohibits temporary or seasonal commercial parking stations in the R–4 area where plaintiffs' property is located. The ordinance was offered in evidence and reference made to the fact that seasonal or temporary commercial parking has been prohibited in the area since 1923, but there is no reference in the brief to any particular section or subsection of the ordinance which zones

the area for residential purposes as therein specified. Ordinance No. 18931, however, does expressly authorize seasonal or temporary off-street commercial parking stations in a specific part of the territory zone R–4, but not where plaintiffs' property is located.

Many uses are expressly authorized in the R–4 district, including any use permitted in District R–3, apartment houses, row houses, converted dwellings, boarding houses, and, under certain conditions, lodging houses, clinics for people only, offices of surgeons, physicians and dentists, convents and certain kinds of private clubs, fraternal orders and schools, and various other uses.

Appellants insist that the zoning restrictions here, "confining the use of their land to residential purposes" are "arbitrary and unreasonable" and bear no reasonable relationship to the public health, safety, morals, or general welfare; and that there is absolutely no reason why the rights of property owners, such as plaintiffs, should be so restricted by the ordinance in question. Appellants' theory is "that the entire area surrounding the Municipal Stadium, to and including the lot in question, is completely dominated by the Stadium and the purposes for which it serves"; that this fact "is self-evident to anyone who has ever been to a ball game at the Stadium"; that the character of 24th Street between Michigan and Brooklyn Avenues may have been a strictly residential area at one time, but it has been "fading away for many years" and that that particular characteristic "was finally and completely erased when the Blues Stadium was selected for and converted to a major league baseball park"; that the "entire area is saturated with parking"; that "the operation of plaintiffs' lot for parking was not an innovation * * * but a dignified parking operation in the midst of the very great number that existed in the entire area." Appellants of course refer to illegal parking, including their own operation of a parking station on the lot in question for two seasons, regardless of the provisions of the ordinance, but in the hope that their illegal operation might be legalized by ordinance.

Appellants argue that public welfare demands that this parking on plaintiffs' property be permitted and not prohibited; that the successful operation of the Stadium requires it; that patrons will not attend the ball games unless they have places to park their automobiles; that a report made to the City Plan Commission on January 1, 1955, showed only 6625 parking spaces available, while 9000 spaces were needed; and that the use of plaintiffs' property to provide at least 242 additional parking spaces is "most definitely in the best interests of the general public."

In support of their second point (that the restrictions are for the benefit of a few home owners on 24th Street), appellants say that the failure to include plaintiffs' property in the area opened to commercial parking stations was "due solely to the protests of a select few owners of residential property on 24th Street"; that the plan of the city officials was to have plaintiffs' lot used to aid in alleviating the parking problem; that plaintiffs' lot was not excluded from that plan until after a public hearing was conducted on May 2, 1955; that there was no merit in the protests heard at that time because "the damage to their properties had already resulted when the Stadium had been selected as the new home for the Kansas City Athletics"; that "the use of plaintiffs' lot for parking purposes could not in any material way further affect their properties"; and that further "maintaining a no parking restriction on plaintiffs' land * * * is unjustified, unreasonable and unconstitutional."

In support of the theory that the restriction on parking in the 1955 ordinance "is discriminatory and lacking in uniformity," appellants say the city started out to set up "a rectangular section within * * * which seasonal parking would be permit-

ted," but, after the hearings on the proposal, the area where plaintiffs' property is located was excluded. Appellants refer to a proposed ordinance that was never adopted, but was rejected after a full hearing of evidence for and against the measure. Appellants also insist that the new ordinance adopted in 1957, "perpetuated the discrimination (in defining the new area) and refused to give plaintiffs the equal privilege of being included in the said (parking) zone." Appellants again argue that the Municipal Stadium completely dominates the whole area where plaintiffs' lot is located and insist that that area "is indistinguishable from the balance of the area" where parking is permitted; and that the exclusion of plaintiffs' property is directly contrary to the requirement that zoning be under a comprehensive plan, uniform throughout each district.

In support of their final point that the ordinance is confiscatory, appellants argue that, if the court gives legal sanction to the city's action in zoning the lot for residential purposes and leaves it subject to present restrictions, the lot will be deprived of all practical value; that the lot was vacant and unimproved until 1955; that vacancy and lack of use over the years shows that it has no utility for residence purposes; that its narrow frontage and long depth and the obsolescence of the district about it, as a residential area, show it to be worthless for residence purposes; that the construction of residence property would be economically unsound and financing could not be secured; and that, except for present zoning restrictions, the sale value of the property would be far greater. Appellants insist that "the home owners on 24th Street" should not prevail against the general public interest in more parking facilities; and that a "catastrophic financial loss" should not be caused plaintiffs.

From the evidence reviewed it is apparent that there was directly conflicting oral testimony as to whether or not the opera-

tion of a commercial parking station on plaintiffs' property was in fact detrimental and damaging to the immediate residential neighborhood in which it was operated. There was conflicting oral testimony as to whether the area surrounding plaintiffs' property, was well maintained, middle-income, single family homes, which, except for its small area could reasonably expect an R-1 residential rating, or whether by age and obsolescence the whole area had declined to such an extent that any additional commercial parking in the particular area could not "further aggravate the situation." A question of fact was presented as to whether or not "whatever damage to the value of their homes, which would ever be done, had already been accomplished by virtue of the establishment of the Municipal Stadium" and the noise, traffic and other conditions attending it or whether conditions would be remedied by a discontinuance of plaintiffs' illegal operation. There was conflicting oral testimony as to whether additional seasonal or temporary commercial off-street parking was needed in the area where the Municipal Stadium was located or whether the need for such parking had either been supplied or would be provided for in the area opened to such parking lots by the ordinance of May 20, 1955. There was conflicting oral testimony as to whether the residential area R-4 surrounding plaintiffs' property was materially different in degree from the R-4 area opened to commercial parking stations by the mentioned ordinance of 1955. From the evidence presented the City Plan Commission and City Council could have reasonably made the classification upon which they acted in determining where commercial parking lots should be allowed and where prohibited.

Further, plaintiffs' own evidence shows no financial loss, since the property subject to present zoning restrictions is still worth more than the cost of the property and the improvements. Whether plaintiffs' property free from restrictions would be worth any materially larger sum, if it could be

used for commercial parking lot purposes, presented an issue as to the credibility, weight and value of said testimony. In any event that issue was not a decisive one.

Much is sought to be made of the fact that some of the witnesses for the city in this cause had vigorously opposed the location of the Municipal Stadium in the negro section of the city, adjacent to Lincoln High School and Lincoln Coles Junior High School, without sufficient provision for off-street parking on the premises, or surrounding area. They opposed it on the theory that the noise, traffic and crowds, congestion and Sunday games would adversely effect the entire negro neighborhood, and be detrimental to their homes east, west, north and south of the Stadium. All admitted the tremendous impact of the establishment and operation of the Stadium throughout the area, but the principal question presented here is, Was there a sound basis in fact for fixing the boundary lines of the new commercial off-street parking area where it was fixed by the ordinance, which excluded the area in which plaintiffs' property was located? Giving due deference to the trial court's better opportunity to judge of the credibility of the witnesses and to better weigh and determine the value of the oral testimony presented before him on the various issues of fact presented, we think the judgment must be sustained. Clearly, the court could properly find that the city could have reasonably made its findings and reached its decision, as evidenced by the ordinance, upon consideration of substantial evidence favorable to the decision reached.

The applicable legal principles governing a case such as this are fully reviewed in the case of Flora Realty & Investment Company v. City of Ladue, en banc, 362 Mo. 1025, 246 S.W.2d 771, 778; and in Deacon v. City of Ladue, Mo.App., 294 S.W.2d 616, 624, 625. The applicable principles of law set forth in these cases need not be reviewed or restated here in an action that turns to such an extent upon the credibility, weight and value of the oral testimony presented.

■ We find that this record shows a reasonable, sound and rational basis for the classification by which the area where plaintiffs' property is located is excluded from the area in which temporary or seasonal off-street commercial parking stations are allowed. The classification, supported as it is by substantial evidence showing a basis therefor, may not be said to be arbitrary or unreasonable nor do we find the prohibition against commercial parking stations in the area arbitrary or unreasonable. The restrictions bear a reasonable relationship to health, safety, morals, public convenience and general welfare in that area. The public interest in recreation and in sports at the Stadium cannot control here, particularly in view of the evidence that adequate parking for patrons of the Stadium is available in the more immediate area.

On this record there has been no discrimination or lack of uniformity in fixing the division line between the areas in which such parking is allowed and that in which it is prohibited. There has been no confiscation of plaintiffs' property, but plaintiffs have been legally and validly prohibited by a reasonable zoning regulation from using their property to the detriment and damage of the residential area in which it is located.

The judgment is affirmed.

All concur.